IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**THU B. HOANG**,

        Plaintiff,

  vs.

**WELLS FARGO BANK, N.A.**,

        Defendant.

Civil Case No. 09-819-KI

OPINION AND ORDER

Peter L. Fels
The Carter Building
211 E. Eleventh Street, Suite 105
Vancouver, Washington  98660

      Attorney for Plaintiff

Allyson S. Krueger
Hitt Hiller Monfils & Williams, LLP
411 SW Second Avenue, Suite 400
Portland, Oregon  97204

      Attorney for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Thu Hoang is a former employee of defendant Wells Fargo Bank N.A.  Hoang

brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and

under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.  Before the court is

Wells Fargo's Motion for Summary Judgment (#17).  For the reasons set forth below, I grant the

motion.

**FACTS**

Hoang was employed by defendant Wells Fargo as a mortgage specialist from 2001

through 2009.  In January 2009, Wells Fargo discharged Hoang for taking unapproved time off

and for violating the company's code of ethics.

Hoang is diagnosed with bipolar disorder.  According to Hoang, she was first diagnosed

with bipolar disorder in 1982, when she was hospitalized following the birth of her child.

Between 1982 and 2006, Hoang did not seek or receive any medical treatment or therapy for

bipolar disorder.  In September of 2006, however, following a family vacation, Hoang took at

least two weeks of medical leave for what she characterized as a "mental breakdown." Decl.

Allyson Krueger Ex. 1 at 7.  At that time, Hoang's husband sent an email to the district and

regional managers of Hoang's division at Wells Fargo, Susan Young and Colin Lewis.  The email

read, in part,

> Thu had a mild illness (her doctor said stress-related bipolar disorder) before and
> during her recent vacation . . . . I need to know if she is qualified for any disability
> benefits . . . during her treatment . . . . I need you both to keep the above
> information professionally confidential, so that Thu can return to work and
> continue her exemplary service to the company without any problems, after her
> successful treatment.

Page 2 - OPINION AND ORDER

Decl. Peter Fels Ex. 1, at 92.  This was the only instance when anyone revealed to a Wells Fargo

employee, other than Leave Management personnel, that Hoang had bipolar disorder.  There is

no evidence that Young or Lewis breached the confidentiality that Mr. Hoang requested in his

email.

During the 2006 leave, Hoang applied for and received short-term disability benefits from

Wells Fargo.  In the same period, Hoang became a patient of psychiatrist Dr. Jeffrey Hansen,

who agreed with the bipolar diagnosis.  Hoang began taking Lithium and Zyprexa.

Hoang did not use any medical leave during 2007, although she did use all of her paid

time off ("PTO") for vacations.  Wells Fargo provided employees with PTO that could be used

for vacation, illness, or a variety of other activities.  Employees were expected to schedule PTO

in advance, unless the PTO was due to illness or another emergency.  Approval of PTO was

based on considerations such as work flow and other business needs, and was typically handled

by supervisors.

Medical leave, on the other hand, was administered by Wells Fargo's Leave Management

department.  If a Wells Fargo employee requested seven or more days of medical leave, Leave

Management provided the employee a packet containing information about short-term disability

and leave benefits.  At the time of Hoang's employment, a third party, MetLife, evaluated all

claims for short-term disability.  In order to qualify for disability benefits, an employee was

required to submit medical documentation.  If a Wells Fargo employee submitted medical

documentation sufficient to satisfy the criteria for disability benefits under the MetLife policy,

Wells Fargo's Leave Management automatically considered the time off to be covered by FMLA.

If MetLife denied the request for STD benefits, however, Leave Management provided the

employee with a Medical Certification Form and instructed employees to have their doctor complete the form, and return it to Leave Management. After receiving the Medical Certification Form, Leave Management would make a decision about whether the requested leave qualified as FMLA leave. If the form was not returned, Leave Management followed up with the employee and requested its completion again.

In 2008, Hoang used all of her PTO for the entire 2008 year during a one month vacation to Asia in January. According to Dr. Hansen, in May 2008, Hoang suffered a severe episode of her bipolar illness, and he recommended to her that she cease working completely from May through September.[1] Hoang persuaded Dr. Hansen, however, to write a note recommending that she work three days per week, which he did. It read, in its entirety, "Please allow 3 day work week for next 4 weeks and then may return without restriction." Krueger Decl. Ex. 1, at 57. In later correspondence with Wells Fargo Leave Management, Dr. Hansen increased the amount of time Hoang need off from work. Dr. Hansen also told Hoang she should go to therapy once or twice per week during the leave period, and made a referral. But Hoang did not schedule or attend any therapy sessions. Nevertheless, supported by the note, in June 2008, Hoang requested medical leave in the form of a reduced work schedule of three days per week. None of Hoang's managers at work knew why she needed a reduced schedule, or that Hoang carried a bipolar diagnosis. Nevertheless, Wells Fargo's Leave Management department accommodated the request after receiving appropriate medical documentation, writing that Hoang was "approved to work 24 hours per week, and expected to return to full time duty on 8/14/2008." Fels Decl. Ex.

---

[1] There are no records about the details of Hoang's severe episode of bipolar disease. Dr. Hansen's medical records from the relevant time period primarily discuss Hoang's marital problems.

1, at 110.  Hoang worked Monday through Wednesday from June 5 through August 14, 2008, when Dr. Hansen released her for full time work.  In addition to the scheduled days off during that period, Hoang missed a number of other work days.

On September 4, 2008, Wells Fargo issued a First Written Warning letter ("warning letter") to Hoang for excessive absences unrelated to her use of protected leave.  During 2008, Hoang had unapproved absences on January 1, March 17, May 27, May 29, June 30, July 1, July 2, August 5, August 13, and August 25.  All of the absences during her reduced work schedule fell on days when she was scheduled to be at work.  Hoang explained that "when I took days off because of my bipolar disease, it was often on a Monday or before or after a holiday because I became depressed or anxious on weekends and holidays."  Decl. Thu Hoang ¶ 12.  According to Hoang, when she had to miss work she would call in and she "would just tell them I was unable to come in that day or that I was sick or did not feel well."  Decl. Thu Hoang ¶ 14.  Hoang contends that she was never told she needed a doctor's note, that she needed to contact Leave Management, or that her absences were a problem.  The warning letter did not itself impose any sanctions on Hoang, although it provided notice, "This is the 1ˢᵗ written warning.  If the behavior continues then a Final Written Warning will be issued.  Should you receive a Final Written Warning, you will not be eligible to receive any salary increase or incentive bonuses for the time you remain on Final Written Warning."  Krueger Decl. Ex. 1, at 51.

According to Hoang, a few days prior to receiving the warning letter, in either late August or the first few days of September 2008, she asked her supervisor Wendy Bussell for unpaid vacation time off in November, and her supervisor orally approved the request.  An email receipt shows that Ms. Hoang had already made reservations at her timeshare in Cabo San Lucas,

Page 5 - OPINION AND ORDER

Mexico on August 18, 2008. Krueger Decl. Ex. 4, at 2. Although there is some confusion about whether Hoang initially asked for the November vacation in late August or early September, no one claims that she made the request prior to August 18. In her deposition, however, Hoang testified that she did not make a reservation until after receiving approval from her supervisor:

> When I first asked Wendy in August for time off in November to go to Mexico, I understood that she said there would be no problem. My husband and I made reservations for our trip because I thought Wendy had approved the time off. We never would have made those reservations or planned to go on specific days if Wendy had told me I could not have the time off. I only found out that Wendy said I could not go when I reminded her about a week before the date of my planned trip in November that I would be off the following week.

Decl. Thu Hoang ¶ 23. According to Bussell, when Hoang approached her in late August, just prior to the issuance of the warning letter, about a vacation in November, she told Hoang that "she could not have the time off because she was out of PTO and the Company was not allowing employees to take any unpaid time off at that time," except for medical leave. Decl. Wendy Bussell ¶ 8. Hoang later told a supervisor that she had planned the trip to Mexico "while out on medical leave," the last date of which was August 14, 2008. Krueger Decl. Ex. 1, at 86. On September 9, 2008, Hoang purchased airline tickets to Mexico, departing November 13 and returning November 20, 2008.

Hoang did not mention the upcoming vacation at work again until November 10, when she claims she reminded Bussell that she was going to be gone. Bussell told Hoang "I don't think you can take off that week." Krueger Decl. Ex. 1, at 24. Later that day, Bussell sent Hoang an email stating "As previously discussed, since you do not have any PTO left I cannot approve any time off until January." Krueger Decl. Ex. 1, at 87. Hoang, upset that she was being told she

Page 6 - OPINION AND ORDER

could not go to Mexico, took the issue up with Bussell's supervisor, Beth Cantu.  In a November

11 email, Cantu summarized a meeting she had with Hoang:

> I explained that she had used up her PTO allotment for 2008 and that taking time
> off without pay is not an option to our team members at this time.  Other team
> members have asked to take time off without pay and this has been declined,
> across the board . . . . [Hoang] asked what the consequences would be if she did
> not report to work.  I stated to Thu that not reporting to work is considered job
> abandonment and after 3 days of not reporting to work she would be fired from
> her position.  Thu stated she would do that.

Krueger Decl. Ex.1, at 86.

The following day, on November 12, Hoang presented her supervisor with a note from

her psychiatrist that simply read, "Please allow off work from 11/13 to 11/21 for medical

treatment."  Krueger Decl. Ex. 1, at 84.  Hoang admits that this was the first time she mentioned

any sort of medical need for the time off.  Hoang testified that her husband had procured the note

from Dr. Hansen by telling him that she needed a break for her mental health.  She testified that

she did not herself speak to Dr. Hansen about the note.  Her testimony contradicts the testimony

of Dr. Hansen, who swore that "[i]n November 2008 Ms. Hoang either met with me in person or

spoke to me on the telephone asking me to support her request for time off from work to go to

Mexico with her husband. . . . I fully supported her need to take this time off because her mood

was unstable and she was depressed."  Decl. Dr. Jeffrey Hansen ¶ 9.  Dr. Hansen declared, "At

the time, Ms. Hoang was having difficult interactions with her husband which had contributed to

her psychotic episode and I considered a vacation with him in Mexico away from other stressors

to be therapeutic under the circumstances."  Hansen Decl. ¶ 10.  There are no records, however,

of a psychotic episode and Dr. Hansen's records show that Hoang's last visit with him was in

August of 2008.  In addition, Hoang testified that if she had not been able to go to Mexico, she would have worked that week.  Krueger Decl. Ex. 1, at 18.

Upon receipt of the note, Bussell immediately advised Hoang to call Leave Management. Hoang did so, and left on her vacation the next day.

The pictures from Hoang's vacation to Cabo San Lucas depict her buying jewelry, drinking alcohol, tanning on the beach, swimming, and eating in restaurants.  Krueger Decl. Ex. 1, at 74-83.  Hoang admitted in her deposition that she did not have any sort of medical treatment during the vacation.

After receiving Hoang's phone call and Dr. Hansen's note, Wells Fargo's Leave Management initiated processing Hoang's absence as medical leave.  Leave Management sent her a packet with paperwork that needed to be filled out in order to process the medical leave and issue short term disability benefits.  Ms. Hoang completed a form called "Authorization to Disclose Information About Me" and faxed it to MetLife.  MetLife subsequently contacted Dr. Hansen to request medical documentation related to Hoang's absence.  Dr. Hansen, however, failed to provide medical documentation to MetLife.  MetLife, therefore, denied the claim for short-term disability benefits.

On December 3, 2008, MetLife advised Wells Fargo that it had denied Hoang's short term disability claim.  Leave Management then sent Hoang a letter explaining the denial and providing Hoang with a Medical Certification Form to complete.  Ms. Hoang never returned the form.  On December 22, Leave Management sent Hoang a letter stating that it had not received her Medical Certification Form and that effective November 13, 2008, it considered her to have been on "an unapproved leave."  Decl. Ruth Redman Ex. 5, at 1.  Hoang did not respond to the letter.  Within

Page 8 - OPINION AND ORDER

a few weeks of the December 22 letter, supervisor Johanna Loders conferred with Laurie Bush in

Wells Fargo's Employee Relations Department and then made the decision to terminate Hoang

for taking an unapproved leave of absence and for violating Wells Fargo's Code of Ethics, which

requires employees to use complete honesty in conducting internal and external business.

Wells Fargo terminated Hoang on January 28, 2009.  At the termination meeting, Bussell

gave Hoang a letter that stated, in part,

> We were recently advised by Leave Processing that your request for medical leave
> for the period November 13, 2008 to November 23, 2008 was denied because you
> did not submit medical certification to support your leave.  As you may recall,
> prior to your requesting "medical leave" for this time period, you had requested
> time off so that you can [*sic*] go with your husband on a vacation trip to Mexico.
> When your request was denied, you nevertheless took the time off and requested it
> as medical leave.  The fact that you did not submit proper medical certification, on
> the Wells Fargo medical certification form, leads us to believe that you used the
> time off to take a vacation rather than for medical reasons.  Under these
> circumstances, we are terminating your employment for taking unapproved leave
> and for a Code of Ethics violation.

Second Decl. Allyson Krueger Ex. 1, at 7.

Hoang later filed the instant lawsuit against Wells Fargo.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Wells Fargo moves for summary judgment against Hoang's ADA and FMLA claims.

I.      ADA

The ADA prohibits discrimination against a qualified individual with a disability.  42

U.S.C. § 12112(a).  Hoang alleges that Wells Fargo violated the ADA by failing to engage in an

interactive process to determine what accommodations she needed and by failing to provide her

with reasonable accommodations, such as relief from its absenteeism policies.

A.      Failure to Engage in Interactive Process

Under the ADA, "employers are required to engage in an interactive process with

employees in order to identify and implement appropriate reasonable accommodations."

 Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1111 (9th Cir. 2000) (en banc), vacated on other

grounds, 535 U.S. 391 (2002).  "The interactive process is triggered either by a request for

accommodation by a disabled employee or by the employer's recognition of the need for such an

accommodation."  Id. at 1112.  An employee is not required to use any particular language when

requesting an accommodation but need only "inform the employer of the need for an adjustment

due to a medical condition."  Id.  The interactive process requires: (1) direct communication

between the employer and employee to explore in good faith the possible accommodations; (2)

consideration of the employee's request; and (3) offering an accommodation that is reasonable

and effective.  Id. at 1114-15.  Liability for failure to provide reasonable accommodations ensues

only where the employer bears responsibility for the breakdown in the interactive process.

Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).

In 2006 and in the summer of 2008, Hoang communicated to Wells Fargo that she needed time off from work due to a medical condition. Hoang provided the appropriate medical documentation and Wells Fargo accommodated her requests by giving her leave and an adjusted three-day work week during each respective period.

In contrast, in late August or early September 2008, when Hoang requested the November 2008 time off, it is undisputed that she did not communicate to her supervisors that her request was connected to a medical condition. As she put it in her deposition, "in September I already need[ed] to have a *vacation* . . . but two more months [*sic*] I will ask Wendy for me to *take a break* because I want Wendy to have prepare[d] for my workload when I leave . . . That's why I go in November . . . that's why I ask for *vacation*." Krueger Decl. Ex. 1, at 19 (emphasis added). Despite the fact that Hoang had used medical leave in the past, she never mentioned needing the November time off for medical purposes. She had always characterized her trip to Cabo San Lucas as a vacation. Therefore, because Hoang did not inform Wells Fargo of the need for an adjustment due to a medical condition, her initial request for time off did not trigger the interactive process.

When Hoang presented Dr. Hansen's note to her manager on November 12, this triggered the interactive process. Following her supervisor's instructions, Hoang then talked to a Leave Management consultant about her need for time off. The consultant documented their interactions, and the same day sent Hoang a packet of paperwork needed to process her request. On December 3, after MetLife denied Hoang's application for STD, Wells Fargo sent Hoang a

request for a medical certification and warned her of the consequences of not responding.  Wells Fargo wrote to Hoang again on December 22 to inform her that the company had not yet received her paperwork.  Hoang's failure to return the requisite documentation to process her time in Mexico as medical leave indicates that the breakdown in communication rested on Hoang's shoulders.

There is no genuine issue of material fact that Wells Fargo did not fulfill its ADA obligation to engage in an interactive process with Hoang because its obligation to do so was never triggered.  Accordingly, I grant summary judgment as to this claim.

      B.     <u>Failure to Accommodate</u>

Hoang also argues that Wells Fargo violated the ADA by failing to accommodate her.

To establish a prima facie case for failure to accommodate under the ADA, it is the plaintiff's burden to show: (1) she is a disabled person within the meaning of the Act; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of the disability. <u>Allen v. Pacific Bell</u>, 348 F.3d 1113, 1114 (9th Cir. 2003).  An unlawful discharge claim under the ADA is often, "from a practical standpoint," the same as a failure to accommodate claim because the consequence of the failure to accommodate is frequently an unlawful termination. <u>Humphrey v. Memorial Hospitals Ass'n</u>, 239 F.3d 1128, 1139 (9th Cir.), <u>cert. denied</u>, 535 U.S. 1011 (2001).

The Ninth Circuit analyzes ADA cases using the burden-shifting analysis from <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 49-50 (2003).  Under <u>McDonnell Douglas</u>, once plaintiff establishes a prima facie case, the

burden shifts to defendant to provide a non-discriminatory reason for the adverse employment action. Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008). If defendant does so, plaintiff bears the burden of showing defendant's reason was a pretext for discrimination. Id. To survive summary judgment, plaintiff must raise a material question of fact that defendant's proffered reason was pretextual. Id.

>              1.    Disabled Person Within the Meaning of the Act

Hoang argues she was a disabled person under the meaning of the Act because of her bipolar diagnosis, which impaired her ability to interact with others.

In order for plaintiff to show she is a disabled person within the meaning of the Act, she must show that she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102. A major life activity is an activity that is "of central importance to daily life." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). Examples of major life activities are "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(iii). "Interacting with others" is also a "major life activity." McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999). The Second Circuit has held that,

> [A] plaintiff is substantially limited in interacting with others when the mental . . . impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people-at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

Jacques v. DiMarzio, Inc., 386 F.3d 192, 204 (2nd Cir. 2004).

Page 13 - OPINION AND ORDER

Hoang's psychiatrist, Dr. Hansen, declared, "When the patient has an episode [of bipolar disorder] she cannot focus or concentrate or maintain effortful attention, she would be unable to remember simple requests, unable to tolerate interaction with the public or any stress."  Hansen Decl. ¶ 3.  There is no evidence, however, indicating that Hoang was experiencing an episode of bipolar or having difficulty interacting with the public prior to her trip to Mexico.  In Hoang's deposition, she was pointedly asked several times about the effects of her bipolar while working at Wells Fargo.  She did not mention any difficulty interacting with others.  In addition, she testified that if she had not gone to Cabo San Lucas, she would have gone to work that week.  At the time Dr. Hansen wrote the note for the November absence, Hoang had not had an appointment with him for at least 75 days.  Dr. Hansen testified that "when her condition is under control she only needs office visits once every 3 months."  Hansen Decl. at ¶ 5.

Dr. Hansen also testified that Hoang contacted him either in person or via phone to obtain the November note, and that he gave it to her "because her mood was unstable and she was depressed."  Id. at ¶ 9.  But Hoang testified that she never contacted Dr. Hansen in November 2008, and that her husband obtained the note:

> I was under extremely [*sic*] stress and I asked and my husband come [*sic*] to Dr.
> Hansen's office to tell Dr. Hansen about my condition, that I couldn't–that I need
> to have a time break for my mental health because he realize [*sic*] my condition.
> And Dr. Hansen give [*sic*] [the note] to my husband.

Krueger Decl. Ex. 1, at 23.  Dr. Hansen's medical records do not reflect an episode of bipolar in November 2008, much less any contact whatsoever from either Ms. Hoang or her husband.  Dr. Hansen's clinical notes reflect that he visited with Hoang on August 14, 2008, and that his next contact with her was during a visit on December 9, 2008.  Krueger Decl. Ex. 6 at 7-8.  To address

the gap in medical records, Dr. Hansen testified, "I do not routinely record every discussion or

contact I have with a patient or her family or employers.  Nevertheless I recall that I advised Ms.

Hoang in 2008 that she should take time off from work as needed for her medical condition."

Pl.'s Ex. at 11.  Although Dr. Hansen's testimony may address the gap in his medical records, it

does not explain Hoang's testimony that it was her husband who obtained the note.

Hoang and Dr. Hansen's conflicting testimony cast serious doubt upon the validity of Dr.

Hansen's declaration.  Nevertheless, Dr. Hansen's declaration creates a genuine issue of material

fact as to whether Hoang was disabled on November 12, 2008, under the meaning of the Act.

2.    <u>Adverse Employment Decision Because of Disability</u>

Despite the genuine issue as to whether Hoang was disabled, her ADA claim fails

because there is no genuine issue of material fact on whether she was discharged because of a

disability.

Again, to establish a prima facie case of failure to accommodate, the plaintiff must show

she suffered an adverse employment decision *because of* a disability.  <u>Allen</u>, 348 F.3d at 1114

(emphasis added).  According to The Americans with Disabilities Practice and Compliance

Manual:

> An employee sustains an adverse employment action within the meaning of the
> ADA if he or she endures a materially adverse change in the terms and conditions
> of employment.  To be materially adverse, a change in working conditions must
> be more disruptive than a mere inconvenience or an alteration of job
> responsibilities.  A transfer from one job to another is not an adverse employment
> action if it involves only minor changes in the employee's working conditions
> with no reduction in pay or benefits.

2 Americans with Disab.: Pract. & Compliance Manual § 7:222 (2010).  Under the ADA, an

adverse employment action is outlawed if it is "motivated, even in part, by animus based on a

plaintiff's disability or request for an accommodation–a motivating factor standard."    Head v. Glacier Northwest Inc., 413 F.3d 1053, 1065 (9th Cir. 2005).

Here, Hoang alleges Wells Fargo took two adverse employment actions by (1) issuing the warning letter, and (2) terminating her employment.  She also argues that both the unapproved absences in the summer of 2008 and the unapproved absence in November 2008 influenced Wells Fargo's ultimate decision to discharge her.  I address each argument in turn.

Hoang contends in her complaint that the warning letter "advised her that she would be ineligible for a raise in 2009."  Compl. ¶ 11.  But the letter actually says Hoang would become ineligible for a raise only if she received a Final Written Warning.  Krueger Decl. Ex. 1, at 51. Therefore, since the letter did not implement any materially adverse change in the terms and conditions of Hoang's employment, it was not itself an adverse employment action.

On other the other hand, there is little doubt that Hoang's termination qualifies as an adverse employment action.  The remaining issue is whether Hoang was terminated because of a disability.

Hoang contends that due to her previous medical leaves, her supervisors knew she had some sort of medical condition.  According to Hoang, the combination of her supervisors' constructive knowledge of a disability and the unapproved absences detailed in the warning letter both influenced her supervisors' ultimate decision to terminate her.  This evidence, taken in the light most favorable to Hoang, is enough satisfy the plaintiff's burden of establishing a prima facie showing that she suffered an adverse employment action because of the disability.

Under the McDonnell Douglas framework, however, Wells Fargo is able to successfully rebut this showing by providing a non-discriminatory reason for Hoang's termination.  According

to the termination letter, Wells Fargo terminated Hoang "for taking unapproved leave and for a Code of Ethics violation."  Second Krueger Decl. Ex. 1 at 7.  Under Wells Fargo's procedure for processing absences as medical leave, documentation to substantiate the need for medical leave was needed from either Dr. Hansen or Hoang.  Despite repeated requests from both MetLife and Wells Fargo's Leave Management department, neither party provided any documentation whatsoever to substantiate the need for medical leave in November 2008.  Given this absence of documentation, it was impossible for Wells Fargo to process the absence as covered medical leave.  Taken together with the fact that for months prior to the absence Hoang had characterized it as a vacation, it was reasonable for Hoang's supervisors to assume she had lied about the need for medical leave in order to go on vacation, and thereby violated the code of ethics.  Wells Fargo, therefore, provides two non-discriminatory reasons for terminating Hoang under the McDonnell Douglas framework.

Hoang, however, raises no facts that would indicate that Wells Fargo's reasons were pretext for discrimination.

Instead, Hoang argues that under the ADA, Hoang was not required to produce documentation of her need for medical leave beyond the November 12 note written by Dr. Hansen.  This argument is also unavailing.

The EEOC's Enforcement Guidance Notice 915.002 illustrates when a request for further documentation is legal:

> Are there situations in which an employer cannot ask for documentation in response to a request for reasonable accommodation?
>
> Yes. An employer cannot ask for documentation when: (1) both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already provided the employer with sufficient information to

substantiate that s/he has an ADA disability and needs the reasonable
accommodation requested.

. . . .

Example B: One year ago, an employer learned that an employee had
bipolar disorder after he requested a reasonable accommodation. The
documentation provided at that time from the employee's psychiatrist indicated
that this was a permanent condition which would always involve periods in which
the disability would remit and then intensify. The psychiatrist's letter explained
that during periods when the condition flared up, the person's manic moods or
depressive episodes could be severe enough to create serious problems for the
individual in caring for himself or working, and that medication controlled the
frequency and severity of these episodes.

Now, one year later, the employee again requests a reasonable
accommodation related to his bipolar disorder. Under these facts, *the employer
may ask for reasonable documentation on the need for the accommodation (if the
need is not obvious),* but it cannot ask for documentation that the person has an
ADA disability. The medical information provided one year ago established the
existence of a long-term impairment that substantially limits a major life activity.

EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the

Americans with Disabilities Act, EEOC Notice 915.002 (October 17, 2002), available at

http://www.eeoc.gov/policy/docs/accommodation.html.

Hoang's situation closely resembles the above example.  The only relevant differences are

(1) the period of time between the previous reasonable accommodation and the next request and

(2) the fact that prior to her eleventh-hour request for time off for medical reasons, she always

characterized it as a vacation.  Under these circumstances, it was certainly permissible for Wells

Fargo to request documentation to prove that the November time off was needed.

For all of the above reasons, I hold there is no genuine issue of material fact that Hoang

was not discharged due to animus based on her bipolar.  In summary then, I grant summary

judgment and dismiss Hoang's ADA claims.

Page 18 - OPINION AND ORDER

II.     Interference under the Family Medical Leave Act

Hoang alleges that Wells Fargo violated the FMLA by interfering with her rights under the Act, taking adverse employment actions against her for use of FMLA leave, and in a number of other ways generally related to a claim for interference.[2]

"The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing her duties for medical reasons." Price v. City of Fort Wayne, 117 F.3d 1022, 1024 (7th Cir. 1997). As such, the FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).[3] Examples of interference include denying leave, discouraging an employee from using leave, and using the taking of leave as a negative factor in employment actions. Xin Liu v. Amway Corp., 347 F.3d 1125, 1133 (9th Cir. 2003). To prevail on a FMLA interference claim resulting in termination, a plaintiff "need only prove by a preponderance of the evidence that . . . taking of FMLA-protected leave constituted a negative factor" in an employment decision. Bachelder, 259 F.3d at 1125. It is

---

[2] The Ninth Circuit has reasoned that an employer's attachment of negative consequences to an employee's exercise of medical leave rights "tends to chill"–and therefore interferes with–the employee's willingness to exercise those rights. Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001). In Bachelder, the Ninth Circuit described FMLA claims for "retaliation" or "discrimination" as those where an employer is accused of discriminating against an employee for opposing practices made unlawful by the FMLA, or for instituting or participating in FMLA proceedings or inquiries. Id. The McDonnell Douglas burden-shifting framework applies to claims for retaliation and/or discrimination in employment, but is inapplicable to claims for FMLA interference claims. Id. at 1125.

[3] The FMLA was revised on January 16, 2009. The previous version of the statutes are applicable in this case. Thus, all cites to FMLA statutes and regulations refer to the prior versions.

undisputed in the case before me that defendant based Hoang's termination, in part, on her

absence to go to Cabo San Lucas. "The pivotal question in this case, then, is only whether the

plaintiff has established, by a preponderance of the evidence, that she is entitled to the benefit she

claims." Id. at 1126. Put otherwise, did Hoang's trip to Cabo qualify as FMLA-protected leave?

The FMLA provides job-protected leave for "a serious health condition that makes the

employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1). The term

"serious health condition" means an illness, injury, impairment, or physical or mental condition

that involves (A) inpatient care . . . or (B) continuing treatment by a health care provider." 29

U.S.C. § 2611(11); 29 C.F.R. § 825.114(a). A person is "unable to perform the functions" of her

job when "the health care provider finds that the employee is unable to work at all or is unable to

perform any one of the essential functions of the employee's position." 29 C.F.R. § 825.115. In

the case of medical conditions, the employer may request medical certification to support the

need for such leave. Bachelder, 259 F.3d at 1130-31. The medical certification may require

medical facts, such as symptoms, which support the certification. 29 C.F.R. § 825.306.

For the purposes of this opinion and order, I assume without deciding that there is a

genuine issue of material fact that Hoang's bipolar diagnosis qualifies as a serious mental health

condition. The issue, then, is whether Hoang was unable to perform any of the functions of her

job when she took time off to go to Mexico.

As discussed above, no health care provider, including Dr. Hansen, found that Hoang was

unable to work or unable to perform any of the essential functions of her job in November 2008.

And again, Hoang testified she would have gone to work if she had not gone to Cabo San Lucas.

In addition, it is implausible that Hoang planned months in advance for a week when she would

Page 20 - OPINION AND ORDER

suddenly be unable to perform the functions of her job. Moreover, Hoang failed to provide the appropriate medical certification. Accordingly, there is no genuine issue of material fact that Hoang's absence from work during her trip to Cabo San Lucas qualified as FMLA-protected leave. Consequently, Hoang has not raised a factual issue on her FMLA interference claim and I grant summary judgment against it.

## CONCLUSION

Wells Fargo's Motion for Summary Judgment (#17) is granted.

IT IS SO ORDERED.

Dated this _____29th_____ day of June, 2010.


                                  __/s/ Garr M. King_____
                                  Garr M. King
                                  United States District Judge